UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL WELLS,

     Plaintiff,

                                 Case No. 21-cv-11032

v.                              Hon. Matthew F. Leitman

ATANER CORPORATION, *et al.*,

     Defendants.

_____/

## <u>ORDER GRANTING DEFENDANTS'</u><br><u>MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 109, 110)</u>

Plaintiff April Wells is a former package delivery driver for Defendants Ataner Corporation and FedEx Ground Package System, Inc.  In 2018, Defendants fired Wells on the ground that Wells committed a violation of their integrity policy when she misled them about crashing her delivery van into a Tim Horton's restaurant.  Wells disputes Defendants' stated basis for her termination.  She alleges that Defendants fired her and subjected her to a hostile work environment because she is an African American woman and based on her age.  She further contends that Defendants retaliated against her and paid her less than her male, non-African American counterparts.  In this action, she asserts both federal and state claims against Defendants based upon her allegations. (*See* Am. Compl., ECF No. 8.)

Defendants have now moved for summary judgment on all of Wells' claims. (*See* Motions, ECF Nos. 109, 110.)   In response to those motions, Wells has presented some evidence that her firing may have been unwarranted and perhaps even unfair.   But she has not presented any evidence that it was based upon her gender, race, or age.   Nor has she shown that Defendants unlawfully retaliated against her, subjected her to a hostile work environment, or paid her less than her male, non-African American colleagues.   Accordingly, for the reasons explained below, Defendants' motions are **GRANTED**.

**I**

**A**

Ataner is a shipping company that delivers packages exclusively for FedEx. (*See* Dep. of Renata Augustyniak at 5-6, ECF No. 113-2, PageID.5419-5420.) Ataner is owned by Renata Augustyniak. (*See id.* at 5, PageID.5419.)

In November 2017, Ataner hired Wells to deliver packages for FedEx. (*See* Wells Dep. at 15-16, ECF No. 113-1, PageID.5093-5094.)   Wells contends that from that point forward, she was jointly employed by both Ataner and FedEx, and for purposes of the pending motions only, FedEx does not dispute that point. (*See* FedEx Mot., ECF No. 109, PageID.3800.)

Ataner's "peak" delivery season ended not long after Wells began work – on December 24, 2017. (Augustyniak Dep. at 84, ECF No. 113-2, PageID.5513.)   At

2

that point, Ataner laid off Wells and all of the other employees it had recently hired to perform deliveries during its busy season. (*See* Wells Dep. at 15, 45-46, ECF No. 113-1, PageID.5093, 5123-5124. *See also* Augustyniak Dep. at 10-11, 54-55, 81-82, 117, ECF No. 113-2, PageID.5125-5126, 5169-5170, 5610-5611, 5546.)  Around that same time, Augustyniak told Wells that Ataner was interested in bringing Wells back to the company in January of the new year. (*See* Wells Dep. at 45-46, ECF No. 113-1, PageID.5123-5124.)  And that is precisely what Ataner did.  In early January 2018, Ataner re-hired Wells to deliver FedEx packages. (*See id.* at 15-16, PageID.5093-5094.)

## B

On the morning of January 11, 2018, Wells was driving one of Ataner's Sprinter oversized vans. (*See id.* at 43, PageID.5121.)  Before beginning work, she stopped for breakfast at a Tim Horton's restaurant near her home. (*See id.* at 46-47, PageID.5124-5125.)  When she arrived at the Tim Horton's, she began to back her van into a parking spot adjacent to the restaurant building. (*See id.* at 57, PageID.5135.)  As she backed in, she "look[ed] out [of her] two side mirrors […] to make sure that [her] tires [were] not touch[ing] the curb [or] the sidewalk." (*Id.* at 57-58, PageID.5135-5136.)  She eventually stopped backing up and pulled "forward" a bit because she "didn't want to get too close to the sidewalk." (*Id.*)

3

After Wells finished parking, she "got out of [her] vehicle and [went] inside the Tim Horton's." (*Id.* at 54, PageID.5132.) Shortly after she entered the restaurant, at least two employees told her that she had "hit the building" with her van. (*Id.*) Wells was surprised because she did not "feel [any] movement" or "feel a bang" while she was parking. (*Id.* at 64, PageID.5142.)

Wells then called both the police and Augustyniak. (*See id.* at 54-55, PageID.5132-5133.) Wells told police that she was "unsure" whether she had hit the building, but that the employees said that she did. (*See id.* at 63-64, PageID.5141-5142.) She said the same thing to Augustyniak. (*See id.* at 66, PageID.5144.) Augustyniak asked Wells to take photographs of her van and the building. (*See id.* at 54, 63-64, PageID.5132, 5141-5142.) Wells then did so and sent the photos to Augustyniak. (*See id.*) The photos depicted Wells' van where it came to rest in the parking spot after Wells completed the parking process by pulling "forward" just a bit. (*See id.* at 59, 220, PageID.5137, 5298.) The photos did not show the van in contact with any portion of the restaurant building. (*See id.* at 59-63, PageID.5132-5141.)

After Wells sent the photos to Augustyniak, Wells drove to Ataner's office and met with Augustyniak. (*See id.* at 65, PageID.5143.) Wells again told Augustyniak that she was "unsure" if she hit the building. (*Id.* at 66, PageID.5144.) During that meeting, Augustyniak said that she had had the chance to review the

photographs that Wells had taken, and based on her review of those photos, Augustyniak did not "think" that Wells had hit the building. (*Id.; see also* Augustyniak Dep. at 93, ECF No. 113-2, PageID.5522.)  Augustyniak also said that she would try to obtain "video footage" of the accident if it existed. (Wells Dep. at 66, ECF No. 113-1, PageID.5144.)  Wells then "continued" her route and made her scheduled deliveries for the day. (*Id.* at 67, PageID.5145.)

Augustyniak changed her mind about the accident when she obtained and reviewed video surveillance from Tim Horton's. (*See* Augustyniak Dep. at 95-96, ECF No. 113-2, PageID.5524-5525.) In Augustyniak's opinion, the video clearly showed Wells hitting the building. (*See id.* at 100-101, PageID.5529-5530.) Augustyniak further concluded, based upon her review of the video, that Wells must have known that she had hit the building and that Wells lied when she claimed that she was uncertain as to whether she had come into contact with the building. (*See id.* at 109, PageID.5538.)

Not long after she viewed the video, Augustyniak spoke with representatives from FedEx. (*See id.* at 99, PageID.5528.)  FedEx had reviewed the video, police report, and other evidence regarding the accident, and like Augustyniak, it concluded that Wells had "hit the building and [was trying to] hide it." (*Id.* at 109, PageID.5538.)   FedEx therefore wanted Wells "disqualified" from delivering

packages for them due to her violation of the company's integrity policy. (*Id.* at 109-110, PageID.5538-5539.)

On January 13, 2018, Augustyniak met with Wells and fired her. (*See* Wells Dep. at 67, ECF No. 113-1, PageID.5145.)   Augustyniak told Wells that she (Augustyniak) had obtained and watched the surveillance video from Tim Horton's, that the video clearly showed Wells hitting the building, and that Wells was being fired due to an "integrity" violation. (*Id.*)   As Augustyniak explained at her deposition, she concluded that Wells had acted with a lack of integrity in two ways: (1) by saying that she was unsure if she had hit the building when, based upon the depiction of the incident on the video, it had to have been obvious to her (Wells) that she had come into contact with the building and (2) by submitting the photos depicting the van after it had been pulled forward in the parking spot so as to falsely "suggest that she didn't even come into contact with the building." (Augustyniak Dep. at 152-153, ECF No. 113-2, PageID.5581-5582.)   Augstyniak further explained that she had to fire Wells based upon these integrity violations because it was FedEx's policy that "[i]f someone ha[d] an integrity issue, they [could not] work for [her] or FedEx" and because FedEx wanted Wells "disqualified" from delivering packages for them based on her violation of the integrity policy. (*Id.* at 108-109, 124, PageID.5537-5538, 5553.)

6

Documentation created at the time of Wells' firing further reflects that Wells was fired due to integrity violations. A FedEx "Disqualification Event Form" completed on January 19, 2018, indicated that Wells was fired for "integrity breaches" after she "lied about [an] accident." (Disqualification Event Form, ECF No. 113-8, PageID.5640.)

## II

Wells filed this action against Ataner and FedEx on May 5, 2021. (*See* Compl., ECF No. 1.) The operative pleading in this case is Wells' First Amended Complaint. (*See* Am. Compl., ECF No. 8.) In that pleading, Wells brings three sets of claims against the Defendants: (1) claims against arising out of her firing, (2) claims related to an alleged hostile work environment, and (3) claims related to the failure to pay her the same amount as comparable male, non-African American drivers. The claims are as follows:

- "Harassment & Discrimination on the Basis of Plaintiff's Sex and Gender in Violation of Title VIII of the Civil Rights Act of 1964" (Count I);

- "Title VII – Gender Based Discrimination – Wage" (Count II);

- Equal Pay Act – Gender Based Wage Discrimination" (Count III);

- "Harassment & Discrimination on the Basis of Race in Violation of Title VII" (Count IV);

- "Retaliation in Violation of Title VII" (Count V);

7

- "Hostile Work Environment in Violation of Title VII" (Count VI);

- "Discrimination on the Basis of Age in Violation of the Michigan Elliot-Larsen Civil Rights Act" (the "ELCRA") (Count VII);

- "Discrimination on the Basis of Plaintiff's Sex & Gender in Violation of the ELCRA" (Count VIII);

- "Discrimination on the Basis of Plaintiff's Race in Violation of the ELCRA" (Count IX);

- "Retaliation in Violation of the ELCRA" (Count X); and

- "Hostile Work Environment in Violation of the ELCRA" (Count XI).

Both Defendants filed motions for summary judgment (*see* FedEx Mot., ECF No. 109, Ataner Mot., ECF No. 110), and the Court held a hearing on both motions on September 6, 2024. The Court is now prepared to rule on the motions.

## III

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be

8

evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

## IV

## A

The Court begins with Wells' claims that the termination of her employment violated both federal and state anti-discrimination statutes.  As noted above, Wells brings gender and race discrimination claims under both federal law (Title VII) and state law (the ELCRA) and an age discrimination claim under state law (the ELCRA). (*See* Counts I, II, IV, VII, VIII, and IX of the First Amended Complaint). In order to survive summary judgment on these claims, Wells must present direct evidence of discrimination or sufficient indirect evidence of discrimination to satisfy the familiar burden-shifting framework described in *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 802-03 (1973).[1] *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) (applying the *McDonnell Douglas* framework to plaintiff's Title VII and ELCRA claims).

---

[1] All parties agree that the *McDonnell Douglas* test governs Wells' federal and state claims of discrimination. (*See* FedEx Mot., ECF No. 109, PageID.3812-3813; Ataner Mot., ECF No. 110-1, PageID.4564-4565; Wells Resp., ECF No. 111, PageID.5044.)

Wells has chosen to rely upon indirect evidence, and the Court must therefore apply the *McDonnell Douglas* framework to her claims.  Under the first step of that framework, Wells must make out "a *prima facie* case of discrimination by a preponderance of the evidence." *Id.* at 613.   In order to do so, she must "demonstrate" that (1) she "is a member of a protected class," (2) she "was qualified for [her] job," (3) she "suffered an adverse employment decision," and (4) she was "treated differently than similarly situated non-protected employees." *Id.* at 606–07. The "burden of establishing a *prima facie* case is not an onerous one." *Id.* at 606.  If Wells satisfies her *prima facie* case, then "the burden shifts to [Ataner and FedEx] to articulate some legitimate, nondiscriminatory reason for the adverse employment action.   Should [Ataner and FedEx] do so, [Wells] then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Id.* (citations omitted) (cleaned up).

**B**

Even though Wells' burden at the *prima facie* stage is not a heavy one, she has not carried it here.  More specifically, she has not satisfied the fourth element of her *prima facie* case that requires her to identify a similarly situated employee outside of her protected class who was treated more favorably then she was. Defendants are therefore entitled to summary judgment on those claims. *See Abebe v. Health and Hospital Corp. of Marion County*, 35 F.4th 601, 604 (6th Cir. 2022)

(holding that plaintiff failed to satisfy *prima facie* case where plaintiff failed to "identif[y] a proper comparator").

In her response to Defendants' motions for summary judgment, Wells identified two comparators outside of her protected class who, she claims, were treated more favorably than she was, but neither comparator is similarly situated to Wells. First, Wells said in her responses that she was "aware of at least one employee (not a member of her protected class) who did not report an accident in which they were involved, and when . . . Ataner's management found out, that employee was not terminated." (Wells Resp. Br., ECF No. 111, PageID.5045.) At the hearing on Defendants' motions, Wells' counsel explained that that employee was a Hispanic man named Mario. But when Wells was asked about Mario at her deposition, Wells acknowledged that she did not know if Mario had failed to report his accident to Ataner:

> Q. Do you know if Mario reported the accident [...]
>
> A. I know Mario, the gentleman that took off the overhead at the bank, he was procrastinating and telling that he did it. He was debating. So I know he probably didn't call in a timely fashion if he was unsure if he should call or not and report it.
>
> Q. Do you know if he eventually reported the accident?
>
> A. I don't know. You have to ask Renata.

11

(Wells Dep. at 91, ECF No. 113-1, PageID.5169.)  This testimony establishes, at most, that Mario did not *timely* report an accident to Ataner; even when construed in the light most favorable to Wells; it does not show that Mario failed to report and/or acknowledge an accident.  And Wells has not presented any evidence that a delay in reporting an accident – in contrast to a failure to acknowledge responsibility, as Wells was accused of – is considered an integrity violation under Defendants' policies.  Moreover, there is undisputed evidence in the record that Ataner *did* fire other employees who violated the company's integrity policy by, among other things, lying about accidents – as Ataner accused Wells of doing here. (*See* Augustyniak Dep. at 29-40, ECF No. 113-2, PageID.5144-5155.)  Under all of these circumstances, the Court concludes that Mario is not similarly situated to Wells.

Second, Wells says that "multiple former co-workers, who were white, male and/or younger . . . had multiple accidents in a short period of time, yet were not terminated." (Wells Resp. Br., ECF No. 111, PageID.5045. *See also* Wells Dep. at 91, ECF No. 113-1, PageID.5169.)  But Defendants did not fire Wells for having an accident.  Instead, they fired her based upon their perception that she displayed a lack of integrity in connection with her reporting of the accident.  And while accidents are often an unavoidable part of work as a delivery driver, a lack of integrity is not. (*See*, *e.g.*, Dep. of Andria Garrett at 53, 63, ECF No. 109-6, PageID.4409, 4418, explaining that discipline for "being [involved] in accidents" is

"progressive" based on the number of accidents a driver is involved in and whether the accidents are "preventable," but "[i]ntegrity breaches" are not subject to "progressive" discipline because there is "zero tolerance" for "integrity breaches"). For these reasons, the employees who were not fired after being involved in accidents were not similarly situated to Wells (who, again, was fired based upon Defendants' perception that she acted with a lack of integrity). *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583-84 (6th Cir. 1992) (explaining that an employee is similarly situated to a plaintiff if that employee "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

Finally, Wells suggests that even if she cannot satisfy the fourth element of her *prima facie* case by identifying a similarly situated comparator, she can make out her *prima facie* case of discrimination with other evidence. She says that a fact-finder may infer that she was fired based on her age, race, and gender because "all of Defendants' Black women employees who drove for Ataner and were over the age of 40 were terminated at the end of the busy season." (Wells Resp. Br., ECF No. 111, PageID.4045.) At first blush, that does sound like potentially persuasive evidence of discrimination. But a closer look shows otherwise. The undisputed evidence in the record reveals that Ataner laid off *all* of its seasonal employees at the end of "peak season," regardless of their age, race, or gender. (Augustyniak Dep.

at 10-11, 54-55, 81-82, PageID.5125-5126, 5169-5170, 5610-5611.)  Moreover, as Wells acknowledges, Defendants *re-hired* her in January 2018 almost immediately after the mass layoff at the end of Defendants' peak season.  The fact that Defendants quickly re-hired Wells after the layoff effectively negates any inference of discrimination (at least as to Wells) that could otherwise have arisen from the layoff.

## C

While the Court concludes that Wells has not established a *prima facie* case of discrimination, the Court recognizes that Wells has raised a number of legitimate concerns about whether her firing was justified.  Indeed, she has persuaded the Court that Defendants may well have erred when they concluded that she attempted to mislead them about the accident.  For instance, Defendants acted as if Wells stated or implied that the photos she took depicted her truck at its closest point to the restaurant building rather than depicting the truck after she pulled forward to complete her parking process, but there is no evidence in the record that Wells ever said that or did anything to imply that.  Moreover, Wells repeatedly told anyone who would listen – including Augustyniak and the police – that she was *unsure* whether she hit the restaurant building; she did not deny that she had done so.  And it makes sense that she could have been uncertain about the impact.  As an Ataner witness who previously worked at FedEx confirmed, because some of the delivery vans are so large, their drivers "regularly" have minor accidents in which they do not feel a

"jolt" or a "bump." (Garrett Dep. at 46-47, ECF No. 109-6, PageID.4402-4403.)  For these reasons and others, there is a serious question on this record as to whether, as Defendants concluded, Wells committed integrity violations when she submitted photos of her truck after it had been pulled forward and when she reported that she was unsure as to whether she had hit the restaurant building with her truck.  Simply put, there is a real question as to whether Wells' termination was warranted.

But what is not open to question is whether Wells' termination was based on her race, age, or gender.  As explained in detail above, Wells has not presented any evidence that it was.  And since the laws under which Wells brings her claims protect against employment *discrimination* – not against unjustified personnel decisions – Defendants are entered to summary judgment on Wells' claims challenging her termination.[2]

## V

### A

The Court next turns to Wells' retaliation claims under Title VII and the ELCRA. (*See* Counts V and X of the First Amended Complaint.)  These federal and state claims are reviewed under the same standard. *See*, *e.g.*, *Wasek v. Arrow Energy*

---

[2] Because the Court concludes that Wells has not satisfied her burden to establish a *prima facie* case of age, race, or gender discrimination, it need not and does not reach the question of whether Defendants' proffered reason for firing Wells was pretextual.

*Services*, *Inc.*, 682 F.3d 463, 482 (6th Cir. 2012) (noting in case where plaintiff brought a retaliation claim under both Title VII and the ELCRA that "the ELCRA analysis is identical to the Title VII analysis"). "Title VII retaliation claims may be proved with direct evidence or by indirect evidence via the *McDonnell Douglas* framework." *Redlin*, 921 F.3d at 613. "Under the [indirect evidence] approach" that applies here, a plaintiff "must first establish a *prima facie* case of retaliation by demonstrating" the following four elements:

> (1) [the plaintiff] engaged in activity protected by Title VII; (2) [the plaintiff's] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Id.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014)). As with Wells' discrimination claims, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

If the plaintiff "succeeds in making out the elements of a *prima facie* case of retaliation, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the termination." *Redlin*, 921 F.3d at 613 (cleaned up). "If the employer satisfies its burden of production, the burden shifts back to [p]laintiff to show that the reason was a pretext for retaliation." *Id.* (cleaned up).

**B**

Wells has failed to establish a *prima facie* case of retaliation because she has

not identified any protected activity that she engaged in before Defendants fired her.

During her deposition, Defendants asked Wells why she believed that Defendants

retaliated against her.  In response to that question, Wells did not identify any activity

protected under Title VII or the ELCRA that she believed led to her firing:

> Q. Do you believe that Ataner in some way retaliated
> against you for, for -- in any way?
>
> A. Yes.
>
> Q. And how is that?
>
> A. Terminating me over something that I didn't say
> because I was a black female and because [Augustyniak's]
> boyfriend helped me out.
>
> Q. And those are the reasons why you feel you were
> retaliated against?
>
> A. Yes.

(Wells Dep. at 103, ECF No. 113-1, PageID.5181.)  In other words, Wells testified

that Defendants retaliated against her when they fired her for (1) making a false

report about the accident at Tim Horton's and (2) accepting help from Augustyniak's

boyfriend.  None of that conduct is protected under Title VII or the ELCRA.  Those

statutes protect "employees from retaliation for having opposed an employer's

unlawful actions" by, for example, "complain[ing] about unlawful practices to a

manager, [a] union, or other employees." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).  These statutes do not protect making reports about vehicle accidents and receiving help from the owner's significant other.  Since Wells has not identified any protected conduct that led to her firing, her retaliation claims fail.

While Wells did not identify any protected conduct when asked to do so in her deposition, she did identify such conduct in a declaration submitted along with her opposition to Defendants' summary judgment motions.  In that sworn statement, Wells says that (1) she engaged in protected conduct by "ma[king] complaints to Ataner's management regarding the different treatment" she experienced as an African American woman and (2) she "faced backlash and retaliation for bringing up the fact of the different treatment." (Wells Decl. at ¶¶ 6-7, ECF No. 113-4, PageID.5616.)

Wells' declaration fails to save her retaliation claims because it is contrary to her deposition testimony in two respects.  The statements in the declaration identifying the purported protected activity are inconsistent with (1) her deposition testimony (quoted above) in which she identifies the universe of conduct for which she was retaliated against and says nothing about complaining about discrimination and (2) another portion of her deposition testimony in which she conceded that she had no "evidence" that "Ataner somehow retaliated against [her] for bringing up a fact that employees were treated differently." (Wells Dep. at 182, ECF No. 113-1,

18

PageID.5261.) It is well-established that "a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [a party's] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Because the statements in Wells' declaration identifying her purported protected conduct are contrary to her deposition testimony, Wells cannot rely on those statements to defeat Defendants' summary judgment motion.

For the reasons explained above, Wells has not identified any competent evidence that she engaged in protected conduct under Title VII or the ELCRA, and Defendants are therefore entitled to summary judgment on her retaliation claims.

## VI

Next, Wells brings claims of a hostile work environment under both Title VII and the ELCRA. (*See* Counts VI and XI of the First Amended Complaint.) In order to establish a hostile work environment claim

> under Title VII or the ELCRA, a plaintiff must demonstrate that (1) [she] belongs to a protected class; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on [a protected category]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action.

*Khalaf v. Ford Motor Co.*, 973 F.3d 469, 472 (6th Cir. 2020) (cleaned up) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)). "When evaluating these

claims . . . [courts] look[] at the totality of the alleged harassment to determine whether it was sufficiently severe or pervasive to alter the conditions of a plaintiff's employment and create an abusive working environment." *Id.* (cleaned up).  The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Id.* (quoting *Phillips*, 854 F.3d at 328).   "For example, in the context of alleged racial discrimination, [the Sixth Circuit] has determined that 'even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements.'" *Id.* (quoting *Phillips*, 854 F.3d at 328).

Wells has failed to meet this "high bar" here with respect to her hostile work environment claims.  When asked directly at her deposition, Wells conceded that she had no "evidence or witnesses to support [her] allegation that [she was] somehow working in a hostile work environment while she was employed at Ataner." (Wells Dep. at 186, ECF No. 113-1, PageID.5264.)  That concession is likely fatal to Wells' hostile work environment claim.

And even if it is not, Wells has failed to identify any evidence of hostility sufficient to establish that she was subject to a hostile working environment.  For example, Wells says that she "would routinely hear Ms. Augustyniak make comments related to employees' ages" and that she would "hear Ms. Augustyniak

routinely make comments related to employees' gender and how that affected their ability to perform tasks, since they could lift heavier items." (Wells Decl. at ¶¶ 1, 3, ECF No. 113-4, PageID.5615.)   But these vague descriptions of statements by Augustyniak are not "severe enough" to constitute a hostile work environment. *See Khalaf*, 973 F.3d at 472 (explaining that to constitute a hostile work environment, harassment must be so "pervasive [as to] alter the conditions of a plaintiff's employment").   Defendants are therefore entitled to summary judgment on these claims.

## VII

Finally, the Court turns to Wells' claim under the Equal Pay Act that she was paid less than similar male, non-African American drivers at Ataner. (*See* Count III of the First Amended Complaint.)   The Equal Pay Act "prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). The following framework governs a plaintiff's claim under the Equal Pay Act:

> In order to establish a *prima facie* case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. §

21

> 206(d)(1)). Jobs need not be identical in order to be considered "equal work" under the EPA. *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265, & n.10 (3d Cir.), cert. denied, 398 U.S. 905, 90 S. Ct. 1696, 26 L.Ed.2d 64 (1970). Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and "resolved by an overall comparison of the work, not its individual segments." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (orderlies and nurses aides perform substantially equal work).

*Id.* at 359–60.

Wells has again failed to establish her *prima facie* case. At her deposition, Wells expressly *denied* that she was bringing any claims that she was paid less than Ataner's male, non-African American employees:

> Q. Are you claiming that you were paid less than male employees when you worked for Ataner?
>
> A. No.
>
> Q. Are you claiming that you were paid less than white employees[?]
>
> A. No.
>
> [....]
>
> Q. Are you making any claim to your knowledge that you were paid less than [...] male or non-African American employees as part of your lawsuit?
>
> A. No.

(Wells Dep. at 102-103, ECF No. 113-1, PageID.5180-5181.) Moreover, Wells did not identify any evidence in her response to Defendants' motions that could establish

she was paid less than male, non-African American employees. (*See* Wells Resp, ECF No. 112, PageID.5074-5075.)   Instead, Wells said that (1) she "directed a subpoena to Paychex" – Ataner's payroll processor – requesting information related to Ataner's "hiring, termination, and pay rates," but Paychex "responded that it had no records" and (2) her counsel was "preparing to file a Fed.R.Civ.P. 56(d) declaration regarding this issue" that would explain what additional discovery Wells needed prior to the Court deciding the summary judgment motions. (*Id.*)   But Wells' counsel never filed a Rule 56(d) affidavit.   In sum, because Wells has not provided any evidence to establish her *prima facie* case under the Equal Pay Act, and because she has not properly sought denial of Defendants' motion under Rule 56(d), her claim under the Act fails.

## VIII

For all of the reasons explained above, Defendants' motions for summary judgment (ECF Nos. 109, 110) are **GRANTED**, and all of Wells' claims are **DISMISSED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 26, 2024

23

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 26, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126